Barry I. Levy, Esq.
Michael Vanunu, Esq.
Philip P. Nash, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,

                                 Plaintiffs,

                -against-

PRABHAT SONI, M.D., PULMONARY AND SLEEP
MEDICAL, P.C., and JOHN DOE DEFENDANTS "1"
through "10",

                          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No.:_____ (       )

**Plaintiff Demands a Trial by Jury**

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively "GEICO" or "Plaintiffs"),

as and for their Complaint against Defendants Prabhat Soni, M.D., Pulmonary and Sleep Medical,

P.C., and John Doe Defendants "1" through "10" ("John Doe Defendants") (collectively, referred

to hereinafter as the "Defendants"), hereby allege as follows:

## **NATURE OF THE ACTION**

1.     This action seeks to recover more than $216,000.00 that the Defendants have wrongfully obtained from GEICO by submitting, and causing to be submitted, hundreds of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable healthcare services styled as extracorporeal shockwave therapy ("ESWT") and ESWT Baseline and Progress Tests ("ESWT Baseline Tests", and together with "ESWT", the "Fraudulent Services").   The Fraudulent Services allegedly were provided to New York automobile accident victims who were insured by GEICO ("Insureds").   In addition to recovering the money wrongfully obtained, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of approximately $481,000.00 in pending no-fault insurance claims for the Fraudulent Services because:

(i)     the Fraudulent Services were allegedly provided by and billed through PSM (as defined below), which is a medical "practice" not under the control and direction of Prabhat Soni, M.D., but rather, was at all relevant times operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers;

(ii)     the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics (as defined below);

(iii)     the Fraudulent Services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds;

(iv)     the claim submissions seeking payment for the Fraudulent Services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided to Insureds; and

(v)     the Fraudulent Services, to the extent provided at all, were not provided by Prabhat Soni, M.D. or any other licensed physician, but by persons who

2

were unlicensed, and were neither directly supervised by Prabhat Soni, M.D. or employed by him or PSM (as defined below).

2.      Defendant Prabhat Soni, M.D. ("Soni") is a New York physician who purports to own and operate a medical "practice," Pulmonary and Sleep Medical, P.C., Tax Identification Number 47-219xxxx ("PSM")(collectively, the "Soni Defendants"), and purports to have used that medical "practice" to provide Fraudulent Services to 198 GEICO Insureds during forty (40) dates of service over a period of approximately three months.  In fact, the Soni Defendants, in combination with the John Doe Defendants, engaged in a massive fraudulent insurance scheme against GEICO and the New York automobile insurance industry in which they billed GEICO more than $710,000.00 for the alleged performance of the Fraudulent Services at nine separate locations from May 3, 2021 to August 2, 2021.  Notably, more than 960 claim submissions were made to GEICO seeking payment of no-fault benefits for the Fraudulent Services, all of which represented that Soni was the legitimate owner of PSM and that he allegedly performed all the Fraudulent Services. In truth, Soni performed none of the Fraudulent Services and did not legitimately own, operate, manage or control PSM.

3.      In or about 2021, the Defendants engineered this fraudulent scheme on the heels of material changes adopted by the New York Department of Financial Services regarding the application of the New York Workers Compensation Fee Schedule ("Fee Schedule") to New York's no-fault reimbursement.  Those changes eliminated billing abuses and fraudulent treatment practices that had plagued the automobile insurance industry for more than a decade by, among other things, (i) making many services that had been historically abused either ineligible for reimbursement or subject to reduced reimbursement, (ii) limiting chiropractor billing to CPT codes in the chiropractic section of the fee schedule, and (iii) controlling reimbursement among providers

who rendered concurrent care to patients by establishing daily reimbursement limits for all related disciplines.

4.      In contrast to these changes, the Fee Schedule changes did not materially alter reimbursement for performance of the Fraudulent Services and, importantly, for the first time established a definitive rate of reimbursement of approximately $700.00 for performance of ESWT, which has historically been a Category III Code (0101T) with a "BR" designation, meaning that definitive reimbursement had not previously been established.  Prior to October 2020, ESWT was virtually never performed on automobile accident patients or billed to automobile insurers, in part because of the lack of established reimbursement and because – if properly performed – service required considerable investment, including direct involvement by a physician in the performance of the service and the use of physical equipment that is very costly and is not typically portable.

5.      Defendants seized on these changes in the Fee Schedule (or lack thereof). The Soni Defendants, in association with the John Doe Defendants, concocted a fraudulent treatment and billing scheme pursuant to which:

>   (i)      unlicensed "technicians" would allegedly render the Fraudulent Services on an itinerant basis at a number of multidisciplinary clinics located throughout the New York metropolitan area that purported to provide treatment to patients with no-fault insurance, but which in actuality were organized to supply convenient, one-stop shops for no-fault insurance fraud (the "Clinics"),
>
>   (ii)     the unlicensed "technicians" would then generate falsified reports to create a false justification for the performance of the medically unnecessary and illusory Fraudulent Services, and
>
>   (iii)    the reports, documents and bills for thousands of dollars per patient per date of treatment would be sent to New York automobile insurance companies, including GEICO, seeking payment for the performance of the Fraudulent Services.

6.      The success of the fraudulent scheme required coordination between the Soni Defendants and the John Doe Defendants.  In furtherance of the fraudulent scheme, they took the following actions:

(i)      Soni allowed the John Doe Defendants to use his name, medical license and PSM to bill GEICO and other New York automobile insurance companies for the alleged performance of the Fraudulent Services;

(ii)      Soni Defendants associated with "processors" who are among the John Doe Defendants.  Processors are individuals and/or entities within the no-fault industry who earn money by: (i) establishing relationships with laypersons that are associated with the Clinics, (ii) collecting the no-fault claims (i.e. the paperwork) from the Clinics for services that are allegedly provided to individuals covered by no-fault insurance, and (iii) referring the no-fault billing and collection work to New York collection lawyers; and

(iii)      The Soni Defendants, through their association with the John Doe Defendants, established illegal referral and kickback arrangements with the owners and/or managers of the Clinics to allow the Defendants to access a steady stream of patients to be able to fraudulently bill GEICO and other automobile insurers, and exploit New York's no-fault insurance system for financial gain without regard to genuine patient care.

7.      Once the pieces were in place, the John Doe Defendants (i) used Soni's medical license and tax identification number of PSM to generate mass quantities false and fraudulent documents, including NF-3 forms (i.e. bills), assignment of benefit forms, and medical records, and (ii) used PSM as a fictional healthcare "practice" to serve as the billing vehicle through which hundreds of thousands of dollars of billing for the Fraudulent Services could be submitted to GEICO and other New York automobile insurers.

8.      Because PSM was nothing more than a shell to hide the John Doe Defendants participation in the scheme, it was equally critical to the success of the fraudulent scheme for the Soni Defendants and John Doe Defendants to partner with New York collection attorneys who were willing to:

(i)      purport to represent the physician and the billing entity;

(ii)    provide for or arrange for "funding" (i.e. financing against receivables) of the fraudulent billing to be submitted to GEICO and other New York insurers in connection with the unlawful scheme through companies in which the attorney/law firms either owned or with whom they had relationships;

(iii)    pursue payment and collection against GEICO and other New York automobile insurers by knowingly (a) submitting fraudulent bills to the insurers for the Fraudulent Services, and (b) pursuing collection lawsuits and/or arbitrations seeking payment on the claims that were denied or claimed to have been improperly paid; and

(iv)    accept the insurance payments received from automobile insurers through their attorney IOLA/Trust accounts, and then distribute the payments to third-parties, including the John Doe Defendants.

9.    At the time, John Doe Defendants had an ongoing relationship with several collection attorneys, and because of their position in the industry and ongoing relationships, the John Doe Defendants had in their possession copies of documents used by the collection lawyers that would be needed to facilitate the funding (i.e. the securing of advances against the claims) and the billing and collections on the fraudulent claims, including documents such as retainer letters, payment directives, and funding agreements.

10.    At the time, John Doe Defendants used the information received from Soni to manufacture: (i) the claim documents necessary to support the fraudulent claim submissions, including assignment of benefits ("AOBs") forms and other medical records, (ii) the engagement letter and associated documents needed by the collection lawyers to bill and collect on the Fraudulent Services, and (iii) the funding agreements to present to companies who were willing to advance money against the receivables ("the Funders"). Once the documents were in place with the Funders, the Funders began transferring money to the John Doe Defendants as "advances" against the claims for the Fraudulent Services. The John Doe Defendants were not signatory to the funding agreements, received the money without risk, and used the payments received from

the Funders for their own benefit, as well as to pay individuals and entities to perpetuate their fraudulent scheme.

11.     The John Doe Defendants regularly provided the package of documents associated with billing, collection and funding efforts to the collection lawyers and thereafter, began to transfer fabricated claim documents to the collection lawyers.  Once the documents were processed by the collection lawyers into bills (i.e. "NF-3" forms) using the name of PSM, the collection lawyers organized the claim submissions and mailed them to GEICO and other insurance companies seeking payment.  The collection lawyers:

  (i)     purported to represent Soni and the Practice in hundreds of writings sent to GEICO;

  (ii)    arranged and/or interfaced to effectuate the "funding" of the bills that were submitted to GEICO and other New York insurers in the name of PSM;

  (iii)   systemically pursued payment and collection against GEICO and other New York automobile insurers on behalf of PSM, and

  (iv)    collected insurance payments from GEICO and other New York automobile insurers and deposited those payments into their IOLA/Trust Accounts or other accounts.

12.     As discussed herein, the Defendants at all relevant times have known that: (i) Soni ceded ownership and control of PSM to the John Doe Defendants who operated, managed and controlled PSM for purposes of effectuating a large scale insurance fraud scheme, (ii) the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons and as a result of illegal financial arrangements between the Defendants and the Clinics, (iii) the Fraudulent Services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds, and (iv) the Fraudulent Services, to the extent provided at all, were never provided by Soni or by any other licensed physician but

by persons who were never supervised by Soni or employed by PSM.  The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that Defendants submitted, or caused to be submitted, to GEICO.

13.    Defendants do not now have -- and never had -- any right to be compensated for or to realize any economic benefit from the Fraudulent Services that they billed to GEICO.

14.    Defendants' fraudulent scheme began in 2021 and has continued uninterrupted through the present day as Defendants continue to seek collection on pending charges for the Fraudulent Services.  As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $216,000.00.

## THE PARTIES

### I.    Plaintiffs

15.    Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.    Defendants and Other Relevant Individuals

16.    Defendant Soni resides in and is a citizen of New York.  Soni is a physician licensed to practice medicine and agreed to "front" as PSM's owner while allowing the John Doe Defendants to use his license and PSM as a billing "vehicle" as part of the fraudulent scheme committed against GEICO and other New York automobile insurers.

17.    PSM is a New York professional corporation that was incorporated on October 28, 2014 that lists its principal place of business as 2523 Avenue O, Brooklyn, New York.  Despite

being incorporated in 2014, PSM never submitted billing to GEICO until May 2021, after Soni agreed to participate in and use PSM as part of the Defendants' fraudulent scheme.

18.     John Doe Defendants "1" through "10" are citizens of New York.  John Doe Defendants "1" through "10" are unlicensed, non-professional individuals and entities, presently not identifiable to GEICO, who knowingly participated in the fraudulent scheme with the Soni Defendants by (i) unlawfully operating, managing and controlling PSM, (ii) establishing relationships with the laypersons associated with the Clinics, (iii) collecting the no-fault claims (i.e. the paperwork) from the Clinics for the Fraudulent Services, (iv) arranged for and providing the funding associated with the Fraudulent Services, and (v) referring the no-fault billing and collection work associated with the Fraudulent Services to New York collection lawyers.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states.

20.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

21.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## <u>ALLEGATIONS COMMON TO ALL CLAIMS</u>

22.     GEICO underwrites automobile insurance in New York.

**I.     <u>An Overview of Pertinent Law Governing No-Fault Reimbursement</u>**

23.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, <u>et</u> <u>seq</u>.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, <u>et</u> <u>seq</u>.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

24.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services, including medical services.

25.     An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

26.     Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").  In the alternative, a health care provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

27.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

28.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York .…  (Emphasis added).

29.     In New York, only a licensed physician may: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

30.     Unlicensed non-physicians may <u>not</u>: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

31.     New York law prohibits licensed healthcare services providers, including physicians, from paying or accepting kickbacks in exchange for patient referrals.  <u>See</u>, <u>e.g.</u>, New York Education Law §§ 6509-a; 6530(18); and 6531.

32.     New York law prohibits unlicensed persons not authorized to practice a profession, like medicine, from practicing the profession and from sharing in the fees for professional services. <u>See</u>, <u>e.g.</u>, New York Education Law § 6512, § 6530(11), and (19).

33.     Therefore, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments or allows unlicensed laypersons to share in the fees for the professional services.

34.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005) and <u>Andrew Carothers, M.D., P.C. v. Progressive Ins. Co</u>., 33 N.Y.3d 389 (2019), the New York Court of Appeals

made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

35.     Pursuant to the No-Fault Laws, only health care providers in possession of a <u>direct</u> assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her health care provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits <u>directly</u> to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

36.     Accordingly, for a health care provider to be eligible to bill for and to collect charges from an insurer for health care services pursuant to Insurance Law § 5102(a), it must be the <u>actual</u> provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

37.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

38.     When a healthcare services provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code was performed on the patient; (ii) the service described by the specific CPT code was performed in a competent manner and in

accordance with applicable laws and regulations; (iii) the service described by the specific CPT code was reasonable and medically necessary; and (iv) the service and the attendant fee were not excessive.

39.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.   Defendants' Fraudulent Scheme

### A.   Dr. Soni and His Recruitment

40.     Soni is a Medical Doctor and became licensed to practice medicine in New York in 1993.  According to public record searches, Soni operates an anti-aging, weight loss, and sexual dysfunction practice under the name "Prabhat Soni, M.D." in Brooklyn from the following location at 2519 Avenue O, Brooklyn, New York (the "Avenue O location"):



41.     According to GEICO's records, it never received any billing for Fraudulent Services purportedly rendered to Insureds by the Soni Defendants from the Avenue O location. Instead, the Soni Defendants purported to render treatment to Insureds from nine (9) separate Clinic locations located in Brooklyn, the Bronx, Staten Island, and Nassau County.

42.     In 2021, Soni was recruited by the John Does Defendants to participate in a complex insurance fraudulent scheme to bill GEICO and other New York automobile insurers hundreds of thousands of dollars for medically unnecessary, experimental, and otherwise reimbursable services.  Based on the arrangement, Soni would receive a periodic payment in

exchange for allowing his name, license and PSM to be used and would contend that he supervised the Fraudulent Services if any insurance company ever inquired.

43.     At the time, Soni was a perfect candidate for the scheme because he was in significant financial debt, including years of delinquency in mortgage payments on the Staten Island home he had purchased in 2004, and a federal tax delinquency.  For example, Soni has not made payments on his mortgage since May 1, 2019, presently owes over $1.4 million to the mortgage company, and the home is subject to a public foreclosure proceeding.  In addition, a personal tax lien was issued against Soni on October 23, 2018, by the Internal Revenue Service ("IRS") in the amount of $13,955.84, and according to public records remains unsatisfied to date.

44.     Shortly before the filing of this complaint, GEICO attempted to speak with Soni to allow him to explain the issues over which GEICO had concerns.  Soni admitted to GEICO during the course of that conversation that: (i) he was not familiar with the Fraudulent Services (i.e. he did not know what ESWT was), (ii) he did not perform or supervise the Fraudulent Services, and (iii) he was not aware of who was performing the Fraudulent Services or where the Fraudulent Services were being performed.

**B.     Gaining Access to Insureds**

45.     PSM had no indicia of legitimate operations.  It had no fixed treatment locations of any kind, did not maintain a stand-alone practice, was not the owner or leaseholder in any of the real property from which it purported to provide the Fraudulent Services, did not employ its own support staff, and did not advertise or market its services to the general public.

46.     In fact, the John Doe Defendants controlled the fraudulent scheme by using the name of Soni and PSM on an itinerant basis in connection with the Performance of the Fraudulent Services from nine separate Clinics, primarily located in Brooklyn, Staten Island, the Bronx, and

Nassau County, where they were given access to steady volumes of patients pursuant to the unlawful referral arrangement, including the following:

| Clinic - Street Address | Clinic – Borough |
|---|---|
| 2088 Flatbush Avenue | Brooklyn |
| 3626 Bailey Avenue | Bronx |
| 1655 Richmond Avenue | Staten Island |
| 1568 Ralph Avenue | Brooklyn |
| 360A West Merrick Road | Valley Stream |
| 611 E 76th Street | Brooklyn |
| 3626 E Tremont Avenue | Bronx |
| 1819 Merrick Avenue | Merrick |
| 550 Remsen Avenue | Brooklyn |

47.     To obtain access to the Clinics' patient base (*i.e.*, the Insureds), the Defendants entered into illegal financial and kickback arrangements with the unlicensed persons who controlled the Clinics, who provided access to the patients that were treated, or who purported to be treated, at the Clinics.   Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics in actuality, were organized to supply "one-stop" shops for no-fault insurance fraud.

48.     The Clinics provided facilities for Defendants, as well as a "revolving door" of healthcare services professional corporations, chiropractic professional corporations, physical therapy professional corporations, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

49.     In fact, GEICO received billing from an ever-changing number of fraudulent healthcare providers at many of the Clinics, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing

insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

50.     For example, GEICO has received billing for purported healthcare services rendered at the Clinic located at 1568 Ralph Avenue, Brooklyn from a revolving door of more than one hundred (100) purportedly different healthcare providers, and from the Clinic located at 1655 Richmond Avenue, Staten Island, from a revolving door of more than 140 purportedly different healthcare providers.

51.     Additionally, the Clinics located at 2088 Flatbush Avenue, 1568 Ralph Avenue, and 611 E 76th Street in Brooklyn were all referenced as Clinics were purported ESWT was performed as part of a fraudulent scheme similar to the one alleged in this Complaint in the recently filed Gov't Emp. Ins. Co., et al. v. Stybel, et al., Docket No. 1-:22-cv-02834-PKC-MMH (E.D.N.Y. 2022).

52.     At each of the Clinics, unlicensed laypersons, rather than any healthcare professionals working in the Clinics, developed and controlled the patient base.  The Clinics willingly provided access to the Defendants in exchange for kickbacks and other financial incentives because the Clinics were facilities that sought to profit from the "treatment" of individuals covered by no-fault insurance and therefore catered to high volumes of Insureds at the locations.

53.     In general, the referral sources at the Clinics were paid a sum of money in untraceable cash or payments typically disguised as "rent".  They were in reality, kickbacks for referrals, and the relationship was a "pay-to-play" arrangement. In connection with this arrangement, when an Insured visited one of the Clinics, he or she was automatically referred by one of the Clinic's "representatives" for the performance of the Fraudulent Services.

54.     As a result of this arrangement, the Defendants subjected Insureds at the Clinics to the Fraudulent Services despite there being no clinical basis for the services, had them undergo phony testing, and submit to purported therapy services that were experimental and investigational, among other things, all solely to maximize profits without regard to genuine patient care.

55.     In keeping with the fact that the Clinics controlled the patient base and that PSM was simply one of several interchangeable "cogs" in the fraud wheel, there were numerous instances between May 2021 and August 2021 where PSM was (i) allegedly providing the Fraudulent Services on Insureds at a Clinic location at the same time that other medical practices were performing the Fraudulent Services on Insureds, and (ii) was one of numerous "providers" rendering the Fraudulent Services at specific Clinic locations in alternating weekly sequences.

56.     For example, of the 198 Insureds who purportedly received Fraudulent Services through PSM at the Clinics identified above, over 75% also received ESWT through at least one other entity that also billed GEICO for rendering ESWT.

57.     The Clinic "representatives" typically making the referrals were receptionists or some other non-medical personnel who simply directed or "steered" the Insureds to whichever practice was being given access to the Insureds on a given day pursuant to the unlawful payment and referral arrangement.

### C.     Defendants Place the Fraudulent Scheme In Motion

58.     Once all the necessary "pieces" were in place and Soni had turned control over to the John Doe Defendants, the fraud scheme was placed into overdrive.   John Doe Defendants began to illegally operate and manage PSM and implemented the fraudulent billing and treatment scheme using a "quick hit" strategy, billing GEICO and other New York automobile insurers hundreds of thousands of dollars for the performance of the Fraudulent Services in a matter of

18

months, thereby attempting to limit the insurance companies' ability to investigate and address the scheme.

59.     As part of the scheme, the John Doe Defendants arranged to have the account receivables associated with the GEICO billings for the Fraudulent Services "funded" through companies with the assistance of the collection lawyers and arranged for documents to be signed directing the payments to be made to them and other third parties rather than Soni.

60.     As a result of those efforts, the John Doe Defendants received hundreds of thousands of dollars in advances on the claims for the Fraudulent Services from the Funders without any risk because they were never signatory to the agreements.  In addition, the John Doe Defendants had the collection lawyers begin billing GEICO and other New York automobile insurers for the Fraudulent Services.

61.     Through the funding and collection arrangement, the John Doe Defendants controlled PSM and were able to realize an immediate financial benefit because they were paid a percentage on the face value of the billings submitted to GEICO for the Fraudulent Services.  The collection lawyers (in turn) would be compensated through the payment of other monies from the insurance companies, including legal fees associated with the collections as well as interest and other charges to be repaid from the collections on the claims for the Fraudulent Services.

62.     In furtherance of this scheme, from May 3, 2021 through August 2, 2021 (during a period of approximately 90 days), GEICO received through the United States Mail, bills, assignment of benefit forms ("AOBs"), and other records from the Defendants (through the collection lawyers) with respect to more than 960 bills involving 198 separate patients and seeking payment of more than $710,000.00.

63.     Each of the claims was accompanied by a letter from the collection lawyers, representing that they were legal counsel to PSM in connection with the collection of charges from GEICO for the performance of the Fraudulent Services.

**D.      The Fraudulent Billing and Treatment Protocols Employed by The Defendants**

64.     The Fraudulent Services billed in the name of PSM were not medically necessary and were provided, to the extent they were provided at all, pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.  The Fraudulent Services were further provided pursuant to the dictates of unlicensed laypersons not permitted by law to render or control the provision of healthcare services.

65.     Neither Soni nor any other licensed physicians were ever involved in the performance of the Fraudulent Services.   In fact, unlicensed laypersons, rather than any healthcare professionals working in the Clinics, developed and controlled the patient base at the Clinics.  Once they were given access, John Doe Defendants arranged to have Insureds at the Clinics subjected to the Fraudulent Services by unlicensed technicians that they controlled despite there being no clinical basis for the services and submit to purported therapy services that were experimental and investigational, among other things, all solely to maximize profits without regard to genuine patient care.

66.     In fact, there was no physician involvement with the performance of any of the Fraudulent Services and the only point in having the Insureds seen by the unlicensed technicians was to get the patient's signature on a piece of paper so that the John Doe Defendants could get money from the Funders and transmit the claims to the collection lawyers so that they could

generate bills and submit them to GEICO seeking payment for the Fraudulent Services to earn their compensation.

67.     Regardless of the nature of the accidents or the actual medical needs of the Insureds, John Doe Defendants purported to subject virtually every Insured to a pre-determined fraudulent treatment protocol without regard for the Insureds' individual symptoms or presentment.

68.     Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

69.     No legitimate physician or other licensed healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices. This conclusion is reinforced by the fact that there was no physician involvement in any of the Fraudulent Services allegedly performed on Insureds and billed to GEICO.

### 1.     The Fraudulent Charges for "Extracorporeal Shockwave Therapy" and "Shockwave Therapy Baseline and Progress"

70.     The Defendants purported to systemically subject Insureds to medically unnecessary ESWT "treatments" including purported "Shockwave Therapy Baseline and Progress" testing and ESWT.  In keeping with the fact that the Defendants intended to conceal the absence of any physician involvement and that PSM was just one of several billing entities that they used, the John Doe Defendants arranged to have the services documented on a generic "form" that sometimes identified Soni and PSM the form and included what purported to be Soni's signature verifying the treatment.

71.     The following is a representative example:

72.     Of consequence, the claims submitted to GEICO by the Defendants with an NF-3 form falsely represented that Soni performed the Fraudulent Services:



73.     The billing data associated with the claims submissions made to GEICO corroborates the fraudulent nature of the billing/treatment protocols.   According to the billing for ESWT Treatment alleged to have been performed on Insureds on 40 dates of service occurring

between May 3, 2021 to August 2, 2021 (92 days):  (i) billed for performing than 960 different services; (ii) the services were performed on 198 separate Insureds; (iii) at nine separate locations; and (iv) the services were provided at multiple locations at the same day, at as many as five separate treatment locations on the same day.

74.     Additionally, and in further support of the fact that the billing submitted by the Defendants falsely represented that Soni performed the actual service, in April 2022 a member of GEICO's Special Investigations Unit spoke with Soni outside the Avenue O location and Soni confirmed he only works at the Avenue O location.

75.     Once documented by the unidentified technicians, the Defendants then billed GEICO for the performance of ESWT using the tax identification associated with PSM using CPT code 0101T.

**CATEGORY III CODES**                                                                                       **0042T–0504T**
**Medical Fee Schedule**                                                                             **Effective April 1, 2019**

| | Code | Description | Relative Value | FUD | PC/TC Split |
|---|---|---|---|---|---|
| ■ | 0042T | Cerebral perfusion analysis using computed tomography with contrast administration, including post-processing of parametric maps with determination of cerebral blood flow, cerebral blood volume, and mean transit time | 15.44 | XXX | |
| ■ + | 0054T | Computer-assisted musculoskeletal surgical navigational orthopedic procedure, with image-guidance based on fluoroscopic images (List separately in addition to code for primary procedure) | 2.47 | XXX | |
| ■ + | 0055T | Computer-assisted musculoskeletal surgical navigational orthopedic procedure, with image-guidance based on CT/MRI images (List separately in addition to code for primary procedure) | 3.23 | XXX | |
| | 0058T | Cryopreservation; reproductive tissue, ovarian | BR | XXX | |
| | 0071T | Focused ultrasound ablation of uterine leiomyomata, including MR guidance; total leiomyomata volume less than 200 cc of tissue | BR | XXX | |
| | 0072T | Focused ultrasound ablation of uterine leiomyomata, including MR guidance; total leiomyomata volume greater or equal to 200 cc of tissue | BR | XXX | |
| ■ | 0075T | Transcatheter placement of extracranial vertebral artery stent(s), including radiologic supervision and interpretation, open or percutaneous; initial vessel | 18.68 | XXX | |
| ■ + | 0076T | Transcatheter placement of extracranial vertebral artery stent(s), including radiologic supervision and interpretation, open or percutaneous; each additional vessel (List separately in addition to code for primary procedure) | 17.50 | XXX | |
| | 0085T | Breath test for heart transplant rejection | BR | XXX | |
| + | 0095T | Removal of total disc arthroplasty (artificial disc), anterior approach, each additional interspace, cervical (List separately in addition to code for primary procedure) | BR | XXX | |
| + | 0098T | Revision including replacement of total disc arthroplasty (artificial disc), anterior approach, each additional interspace, cervical (List separately in addition to code for primary procedure) | BR | XXX | |
| ■ | 0100T | Placement of a subconjunctival retinal prosthesis receiver and pulse generator, and implantation of intra-ocular retinal electrode array, with vitrectomy | 16.22 | XXX | |
| ■ | 0101T | Extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy | 2.78 | XXX | |

76.    As noted, CPT code 0101T is listed in the Fee Schedule as a "temporary code" identifying emerging and experimental technology. Temporary codes may become permanent codes or deleted during updates of the code set.   Additionally, and as noted in the Fee Schedule, the CPT code (i) is scheduled to be paid using the conversion rate for surgical services, and (ii) does not distinguish between a professional component and technical component, thus confirming that the service need be performed by a licensed physician to be reimbursable.

77.    Furthermore, the charges were fraudulent because the use of ESWT for the treatment of back, neck, and shoulder pain is experimental and investigational in nature.  In fact, and in keeping with that characterization: (i) the use of ESWT has not been approved by the US Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain, (ii) there are no legitimate peer reviewed studies that establish the effectiveness of ESWT for the treatment of back, neck, or shoulder pain, and (iii) the Centers for Medicare & Medicaid Services has published coverage guidance for ESWT stating that further research is needed to establish the efficacy and safety of ESWT in the treatment of musculoskeletal conditions; that there is uncertainty associated with this intervention; and it not reasonable and necessary for the treatment of musculoskeletal conditions and therefore not covered.

78.    As part of the fraudulent scheme, the Defendants also purportedly provided "Shockwave Therapy Baseline and Progress" testing ("Baseline Testing") to Insureds, billed to GEICO under CPT Code 97799, which is a by-report code described as an "[u]nlisted physical medicine/rehabilitation service or procedure." The Defendants routinely provided this "baseline" test *after* an Insured had already received ESWT from the Defendants.  The reports submitted by the Defendants do not explain what was tested or how it relates to the purported need for ESWT,

and, to the extent it was administered at all, was simply another medically unnecessary test designed solely to maximize profits without regard to genuine patient care.

79.     In addition, and as part of their scheme, the Defendants virtually always submitted multiple bills to GEICO for the treatment purportedly rendered to an Insured on the same date of service in an effort to keep the individual totals on each bill artificially lower and avoid detection by GEICO.

80.     Notwithstanding the experimental nature, the Defendants purportedly provided ESWT as part of a pre-determined fraudulent protocol to virtually every Insured, without regard to each Insured's individual complaints, symptoms, or presentation.  The ESWT was provided to Insureds by a myriad of providers at each Clinic location, including the Defendants. In furtherance the fraudulent scheme, the Defendants typically submitted a boilerplate, checklist treatment report. For example:

(i)     On August 10, 2020, an Insured name MQ was purportedly involved in a motor vehicle accident and began treating at a Clinic located at 3626 E Tremont Avenue, Bronx, New York (the "E Tremont Ave. Clinic") on August 24, 2020.  Ribeiro Pain Management PLLC ("Ribeiro Pain") submitted billing to GEICO for ESWT and Baseline Testing purportedly rendered to MQ at the E Tremont Ave. Clinic on February 22, 2021. Thereafter, the Defendants submitted two separate bills to GEICO for ESWT purportedly rendered to MQ at the E Tremont Ave. Clinic on May 3, 2021, and four separate bills to GEICO for ESWT purportedly rendered to MQ at the E Tremont Ave. Clinic on June 1, 2021.

(ii)    On October 31, 2020, an Insured name ND was purportedly involved in a motor vehicle accident and began treating at the E Tremont Ave. Clinic on November 5, 2020.  Ribeiro Pain submitted billing to GEICO for ESWT and Baseline Testing purportedly rendered to ND at the E Tremont Ave. Clinic on March 22, 2021.  Thereafter, the Defendants submitted two separate bills to GEICO for ESWT purportedly rendered to ND at the E Tremont Ave. Clinic on May 20, 2021.

(iii)   On December 8, 2020, an Insured name MS was purportedly involved in a motor vehicle accident and began treating at a Clinic located at 2088 Flatbush Avenue, Brooklyn, New York (the "Flatbush Ave. Clinic") on

December 10, 2020.  Ribeiro Pain submitted billing to GEICO for ESWT and Baseline Testing purportedly rendered to MS at the Flatbush Ave. Clinic on February 25, 2021.  Ribeiro Pain submitted additional billing to GEICO for ESWT purportedly rendered to MS at the Flatbush Ave. Clinic on March 11, 2021, March 18, 2021, March 23, 2021, and March 25, 2021.  Ribeiro Pain also submitted billing to GEICO for ESWT and Baseline Testing purportedly rendered to MS on April 26, 2021.  Thereafter, the Defendants submitted two separate bills to GEICO for ESWT purportedly rendered to MS at the Flatbush Ave. Clinic on each of the following dates: May 6, 2021, May 13, 2021, and May 20, 2021.

(iv)    On December 11, 2020, an Insured name WF was purportedly involved in a motor vehicle accident and began treating at a Clinic located at 611 E 76th Street, Brooklyn, New York (the E 76th St. Clinic") on December 28, 2020.  Ribeiro Pain submitted billing to GEICO for ESWT purportedly rendered to WF at the E 76th St. Clinic on March 19, 2021.  Chand Medical, P.C. ("Chand Medical") submitted billing to GEICO for ESWT purportedly rendered to WF at the E 76th St. Clinic on April 8, 2021.  Thereafter, the Defendants submitted two separate bills to GEICO for ESWT and Baseline testing purportedly rendered to WF at the E 76th St.  Clinic on May 18, 2021, and two sperate bills for ESWT purportedly rendered to WF on May 27, 2021.

(v)    On December 17, 2020, an Insured name KH was purportedly involved in a motor vehicle accident and began treating at the E 76th St. Clinic on December 18, 2020.  Ribeiro Pain submitted billing to GEICO for ESWT purportedly rendered to KH at the E 76th St. Clinic on March 26, 2021.  Chand Medical submitted billing to GEICO for ESWT purportedly rendered to KH at the E 76th St. Clinic on April 27, 2021.  Thereafter, the Defendants submitted two separate bills to GEICO for ESWT and Baseline testing purportedly rendered to KH at the E 76th St.  Clinic on May 27, 2021, and two sperate bills for ESWT purportedly rendered to KH on June 2, 2021.

(vi)    On December 27, 2020, an Insured name MA was purportedly involved in a motor vehicle accident and began treating at the Flatbush Ave. Clinic on December 29, 2020.  Ribeiro Pain submitted billing to GEICO for ESWT and Baseline Testing purportedly rendered to MA at the Flatbush Ave. Clinic on March 10, 2021.  Ribeiro Pain submitted additional billing to GEICO for ESWT purportedly rendered to MA at the Flatbush Ave. Clinic on March 23, 2021 and April 26, 2021.  Thereafter, the Defendants submitted two separate bills to GEICO for ESWT and Baseline Testing purportedly rendered to MA at the Flatbush Ave. Clinic on May 6, 2021 and two sperate bills for ESWT purportedly rendered to MA on May 13, 2021.

(vii)    On January 8, 2021, an Insured name RC was purportedly involved in a motor vehicle accident and began treating at a Clinic located at 1568 Ralph Avenue, Brooklyn, New York (the "Ralph Ave. Clinic") on January 22, 2021.  Ribeiro Pain submitted billing to GEICO for ESWT and Baseline Testing purportedly rendered to RC at the Ralph Ave. Clinic on March 2, 2021.  Thereafter, the Defendants submitted three separate bills to GEICO for ESWT purportedly rendered to RC at the Ralph Ave. Clinic on May 13, 2021, and two seperate bills for ESWT purportedly rendered to RC on each of the following dates: May 19, 2021, May 27, 2021, June 2, 2021, and June 10, 2021.

(viii)    On April 2, 2021, an Insured name SC was purportedly involved in a motor vehicle accident and began treating at a Clinic located at 1655 Richmond Avenue, Staten Island, New York (the "Richmond Ave. Clinic") on April 8, 2021.  Chand Medical submitted billing to GEICO for ESWT purportedly rendered to SC at the Richmond Ave. Clinic on April 19, 2021 and April 26, 2021.  Thereafter, the Defendants submitted four separate bills to GEICO for ESWT purportedly rendered to SC at the Richmond Ave. Clinic on May 6, 2021, and two seperate bills for ESWT purportedly rendered to SC on each of the following dates: May 24, 2021 and June 24, 2021.  Following this, Dr. Jean Pierre Barakat, M.D. ("Barakat, M.D.") submitted billing to GEICO for ESWT purportedly rendered to SC at the Richmond Ave. Clinic on July 24, 2021.

(ix)    On April 5, 2021, an Insured name DA was purportedly involved in a motor vehicle accident and also began treating at a Clinic located at 3626 Bailey Avenue, Bronx, New York (the "Bailey Ave. Clinic") on April 5, 2021.  Ribeiro Pain submitted billing to GEICO for ESWT purportedly rendered to DA at the Bailey Ave. Clinic on April 26, 2021.  Thereafter, the Defendants submitted two separate bills to GEICO for ESWT and Baseline Testing purportedly rendered to DA at the Bailey Ave. Clinic on May 12, 2021, two seperate bills each for ESWT purportedly rendered to DA on May 24, 2021 and June 2, 2021, three bills each for ESWT purportedly rendered to DA on June 17, 2021 and June 23, 2021, and four bills for ESWT purportedly rendered to DA on June 28, 2021.   Following this, Community Med. Care of NY, P.C. submitted billing to GEICO for ESWT purportedly rendered to DA at the Bailey Ave. Clinic on July 19, 2021 and July 28, 2021.

(x)    On April 30, 2021, an Insured name DM was purportedly involved in a motor vehicle accident and began treating at the Flatbush Ave. Clinic on May 14, 2021.  The Defendants submitted two separate bills each to GEICO for ESWT purportedly rendered to DM at the Flatbush Ave. Clinic on May 25, 2021 and June 3, 2021, and five seperate bills for ESWT and Baseline Testing purportedly rendered to DM on June 29, 2021.  Following this,

Elena Borisovna Stybel, M.D. submitted billing to GEICO for ESWT purportedly rendered to DM at the Flatbush Ave. Clinic on July 12, 2021.

81.     These are only representative examples. Additionally, the Defendants were one of several providers who routinely provided ESWT and Baseline Testing to multiple Insureds involved in the same accident from the same Clinics.  For example:

(i)     On December 4, 2020, two Insureds – KM and YP – were involved in the same automobile accident. Thereafter, KM and YP both presented to the Bailey Ave. Clinic, and each purportedly received ESWT and Baseline Testing from Ribeiro Pain and the Defendants.

(ii)    On December 5, 2020, two Insureds – AH and TW – were involved in the same automobile accident. Thereafter, AG and TW both presented to the Flatbush Ave. Clinic, and each purportedly received ESWT and Baseline Testing from the Defendants.

(iii)   On January 10, 2021, two Insureds – AG and RV – were involved in the same automobile accident. Thereafter, AG and RV both presented to the East 76th Street Clinic, and each purportedly received ESWT and Baseline Testing from the Defendants.

(iv)    On March 3, 2021, two Insureds – FP and MP – were involved in the same automobile accident. Thereafter, FP and MP both presented to the Richmond Ave. Clinic, and each purportedly received ESWT from Chand Medical, the Defendants, and Barakat, M.D.

(v)     On April 10, 2021, two Insureds – DT and ST – were involved in the same automobile accident. Thereafter, DT and ST both presented to the Ralph Ave. Clinic, and each purportedly received ESWT from the Defendants.

(vi)    On April 23, 2021, two Insureds – AB and CH – were involved in the same automobile accident. Thereafter, AB and CH both presented to the Flatbush Ave. Clinic, and each purportedly received ESWT and Baseline Testing from the Defendants.

82.     These are only representative examples. In all the claims identified in Exhibit "1", Defendants falsely represented that Fraudulent Services were medically necessary, when in fact they were not medically necessary for each Insured and provided pursuant to predetermined

fraudulent protocols and were therefore not eligible to collect No-Fault Benefits in the first instance.

83.     In addition to the billing for ESWT being fraudulent for the reasons described above, the charges were also fraudulent because the bills misrepresented the amounts collectible for each date of service.  More specifically, CPT Code 0101T only contemplates the billing for the code once per date of service.  The code specifically describes the service as pertaining to the "musculoskeletal system", not a patient's individual limb or spine/trunk sections.

84.     Notwithstanding the clear language of the code, the bills fraudulently unbundled the service in the billing that was prepared and submitted by duplicating the code multiple times (and increasing the corresponding charges) and submitting multiple bills to GEICO for each area of the body where the ESWT was performed.

85.     In doing so, the Defendants artificially and fraudulently increased the amount of reimbursement to which they would be entitled by three (3) to four (4) times for each date of service.

**E.     The Fraudulent Billing for Independent Contractor Services**

86.     The fraudulent scheme also included the submission of claims to GEICO using PSM seeking payment for services provided by individuals that PSM never employed.

87.     Under the New York no-fault insurance laws, billing entities (including sole proprietorships) are ineligible to bill for or receive payment for goods or services provided by independent contractors.  The healthcare services must be provided by the billing provider itself, or by its employees.

88.     Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that billing entities are not entitled to receive reimbursement under the New

York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals).

89.     From May 2021 through August 2021, more than 960 separate bills were sent to GEICO using the United States Mails seeking payment for the Fraudulent Services purportedly performed by individuals other than Soni, while falsely representing in every bill that Soni was the provider of the service in question.  This was done intentionally and to avoid the possibility that insurance companies such as GEICO would deny the bill for eligibility if an accurate representation had been made regarding who actually performed the services and their relationship to the billing provider, which was being unlawfully operated and controlled by the John Doe Defendants.

90.     In fact, virtually every NF-3 form that was submitted to GEICO appeared as follows:

| 16. IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING | | | | | |
|---|---|---|---|---|---|
| TREATING PROVIDER'S NAME | TITLE | LICENSE OR CERTIFICATION NO | | BUSINESS RELATIONSHIP CHECK APPLICABLE BOX | |
| | | | EMPLOYEE | INDEPENDENT CONTRACTOR | OTHER (SPECIFY) |
| Prabhat Soni | MD | 192569 | | | OWNER |

17. IF THE PROVIDER OF SERVICE IS A PROFESSIONAL SERVICE CORPORATION OR DOING BUSINESS UNDER AN ASSUMED NAME (DBA), LIST THE OWNER AND PROFESSIONAL LICENSING CREDENTIALS OF ALL OWNERS (Provide an additional attachment if necessary)

Prabhat Soni, MD 192569

| 18. IS PATIENT STILL UNDER YOUR CARE FOR THIS CONDITION? | ☒ YES | ☐ NO |
|---|---|---|

19. ESTIMATED DURATION OF FUTURE TREATMENT
UNKNOWN

91. The statements in each of the NF-3 forms were false and fraudulent in that the unlicensed technicians who performed the Fraudulent Services were never (i) employed by Soni or PSM, and (ii) under Soni's direction and/or control.

92. In fact, as shown by the examples above, the unlicensed technicians were simultaneously performing services for multiple other "providers" being operated and controlled by the John Doe Defendants at the same time and were paid without regard to the physician's name or entity through whom the Fraudulent Services were billed.

93. In keeping with the fact that the unlicensed technicians performed the Fraudulent Services under the operation and control of the John Doe Defendants, without regard to the physician's name or entity that billed for the Fraudulent Services, virtually all of the Insureds identified in Exhibit "1" received ESWT from various providers, including the Soni Defendants, at a single Clinic as shown in the examples above.

94. In further support of the fact that the unlicensed technicians performed the Fraudulent Services under the operation and control of the John Doe Defendants without regard to the physician's name or entity that billed for the Fraudulent Services, over seventy five percent (75%) percent of Insureds who purportedly received ESWT from PSM also received ESWT from at least one other ESWT provider at the various Clinic locations.

95.     Because the Fraudulent Services, to the extent provided at all, were performed by individuals not employed by Soni and/or PSM, the Defendants never had any right to bill or to collect No-fault benefits for that reason or to realize any economic benefit from the claims seeking payment for the Fraudulent Services, in addition to all others identified in this complaint.  The misrepresentations and acts of fraudulent concealment outlined in this complaint were consciously designed to mislead GEICO into believing that it was obligated to pay the claim submissions.

### III.     The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO

96.     To support their fraudulent charges, Defendants systematically submitted or caused to be submitted to GEICO hundreds of NF-3 forms, AOBs, and medical reports/records using the name of PSM and its tax identification number seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

97.     The NF-3 forms, reports, AOBs, and other documents submitted to GEICO by and on behalf of Defendants were false and misleading in the following material respects:

    (i)     The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of Defendants uniformly misrepresented that Soni had performed the Fraudulent Services and that his name, license and the tax identification number of PSM was being legitimately used to bill for the Fraudulent Services, making the eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) despite the fact that the John Doe Defendants unlawfully and secretly controlled, operated and managed the medical "practice".

    (ii)     The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of Defendants, uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided.

    (iii)     The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants, uniformly concealed the fact that the Fraudulent Services were provided -- to the extent provided at all – pursuant to illegal kickback and referral arrangements.

(iv)    The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants uniformly misrepresented that the Fraudulent Services were medically necessary when the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and

(v)    The NF-3 forms, letters and other supporting documentation submitted by, and on behalf of, the Defendants, uniformly misrepresented to GEICO that the claims were eligible for payment pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 even though the services were provided by unlicensed individuals not employed by Soni or PSM.

**IV.**    **Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

98.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

99.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systematically made material misrepresentations, concealed their fraud and the underlying fraudulent scheme and went to great lengths to accomplish this concealment.

100.    Specifically, the Defendants knowingly misrepresented and concealed facts related to the participation of Soni in the performance of the Fraudulent Services and Soni's ownership, control and/or management of PSM. Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

101.    Furthermore, Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed, to the extent they were performed at all, pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services. In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the unlicensed

individuals to prevent GEICO from discovering that the Fraudulent Services were not eligible for reimbursement because they were not provided by individuals that were employed by Soni and/or PSM.

102.    GEICO takes steps to timely respond to all claims and to ensure that No-fault claim denial forms or requests for additional verification of No-fault claims are properly addressed and mailed in a timely manner. GEICO is also under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $216,000.00 based upon the fraudulent charges.

103.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## AS AND FOR A FIRST CAUSE OF ACTION
### Against Soni and PSM
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

104.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 103 of this Complaint as if fully set forth at length herein.

105.    There is an actual case and controversy between GEICO on the one hand and Soni and PSM on the other hand regarding more than $481,000.00 in unpaid billing for the Fraudulent Services that has been submitted to GEICO.

106.    Soni and PSM have no right to receive payment from GEICO on the unpaid billing because the billed for services were submitted through a medical practice not legitimately owned or

controlled by a licensed physician, but which was being operated, managed, and controlled by the John Doe Defendants for the purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers.

107.     Soni and PSM have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to illegal kickbacks and referral relationships between the Defendants and the Clinics.

108.     Soni and PSM have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols that serve to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

109.     Soni and PSM have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.

110.     Soni and PSM have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services fraudulently misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

111.     Soni and PSM have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services fraudulently misrepresented that they were performed by Soni and were instead performed - to the extent that they were provided at all - by unlicensed individuals who were neither supervised by nor employed by Soni or PSM.

112.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Soni and PSM have no right to receive payment for any pending bills submitted to GEICO.

### AS AND FOR A SECOND CAUSE OF ACTION
**Against Soni and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

113.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 103 of this Complaint as if fully set forth at length herein.

114.     PSM is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.  Soni and the John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of PSM's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that PSM was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers, (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics, (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds, (iv) the claim submissions seeking payment for the billed for services uniformly

misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided, and (v) the billed for services - to the extent provided at all - were not provided by Soni or any other licensed physician, but by persons who were unlicensed, not directly supervised by Soni or employed by PSM.  The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

115.    PSM's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which the Defendants operated PSM, inasmuch as PSM never operated as a legitimate medical practice, never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for PSM to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through PSM to the present day.

116.    PSM is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by PSM in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $216,000.00 pursuant to the fraudulent bills submitted by the Defendants through PSM.

117.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A THIRD CAUSE OF ACTION
### Against Soni and John Doe Defendants "1" through "10"
### (Violation of RICO, 18 U.S.C. § 1962(d))

118.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 103 of this Complaint as if fully set forth at length herein.

119.     PSM is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

120.     Soni and the John Doe Defendants are employed by and/or associated with PSM. Soni and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of PSM's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that PSM was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers, (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics, (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds, (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly

were provided, and (v) the billed for services - to the extent provided at all - were not provided by Soni or any other licensed physician, but by persons who were unlicensed, not directly supervised by Soni or employed by PSM.  The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

121.    Soni and the John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

122.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $216,000.00 pursuant to the fraudulent bills submitted by Defendants through PSM.

123.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Against All Defendants
### (Common Law Fraud)

124.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 103 of this Complaint as if fully set forth at length herein.

125.    Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

126.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Soni had performed the Fraudulent Services and that his name, license and the tax identification number of PSM was being legitimately used to bill

for the Fraudulent Services, making the eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when in fact Soni never performed any of the services and the  John Doe Defendants unlawfully and secretly controlled, operated and managed PSM, (ii) the representation that the billed for services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided, (iii) the representation that the billed for services were eligible for reimbursement, when in fact the services were provided -- to the extent provided at all – pursuant to illegal kickback and referral arrangements between the Defendants and the Clinics, (iv) the representation that the billed for services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) the representation the billed for services were eligible for payment because the services were provided by Soni, when in fact the services were provided by unlicensed individuals that were never supervised by Soni or employed by PSM.

127.   Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through PSM that were not compensable under New York no-fault insurance laws.

128.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $216,000.00 pursuant to the fraudulent bills submitted by the Defendants.

129.   Defendants extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

130.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A FIFTH CAUSE OF ACTION
**Against All Defendants**
**(Unjust Enrichment)**

131.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 103 of this Complaint as if fully set forth at length herein.

132.    As set forth above, Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

133.    When GEICO paid the bills and charges submitted by or on behalf of PSM for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants improper, unlawful, and/or unjust acts.

134.    Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

135.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

136.    By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $216,000.00.

### JURY DEMAND

137.    Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor and against the Defendants, as follows:

A.      On the First Cause of Action against Soni and PSM, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Soni and PSM have no right to receive payment for any pending bills for the Fraudulent Services submitted to GEICO;

B.      On the Second Cause of Action against Soni and John Doe Defendants "1" through "10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $216,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Soni and John Doe Defendants "1" through "10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $216,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against all Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $216,000.00 together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper; and

E.      On the Fifth Cause of Action against all Defendants, more than $216,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: June 2, 2022

RIVKIN RADLER LLP


By:   /s/ *Barry I. Levy*
        Barry I. Levy, Esq.
        Michael Vanunu, Esq.
        Philip P. Nash, Esq.
926 RXR Plaza
Uniondale, New York 11556
 (516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*